UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | NUMBER |
| **ANDREW C. FOSTER** <br> **ANGELA M. FOSTER** | **02-12221** |
| DEBTORS | CHAPTER 7 |
| **PHAROAH'S PALACE, INC.** | ADV. NUMBER |
| PLAINTIFF | **02-1116** |
| V. | |
| **ANDREW C. FOSTER** | |
| DEFENDANT | |

## MEMORANDUM OPINION

### Introduction

Andrew Foster, the chapter 7 debtor, had an oral agreement to place radio advertising for the plaintiff, Pharoah's Palace, Inc. ("Pharoah's").[1] The plaintiff contends that Foster obtained several contract payments from it through fraud or false pretenses. Foster denies that he ever intended to defraud Pharoah's.

The plaintiff's complaint alleged that its claim against Andrew Foster was non-dischargeable under 11 U.S.C. §523(a)(2)(A) and (a)(4). In its pretrial memorandum and at trial, Pharoah's acknowledged that it was pursuing relief under section 523(a)(2)(A) only, and orally amended its complaint to seek judgment against Foster for $28,861.45, which it sought to have declared nondischargeable.

---

[1] Although the Court is mindful of the correct spelling of the title of the ruler of ancient Egypt, the plaintiff apparently was not. This opinion will use the spelling in the complaint.

The Court concludes that Foster's obligation to Pharoah's is nondischargeable in part.

## Facts

Pharoah's operates Baton Rouge area nightclubs known as the Texas Club and Triple A Bar & Grill.  In 1996 Foster orally contracted with Pharoah's, through its president, Michael Rogers, to provide advertising services for its clubs.  Typically, Foster would place advertising spots for the bars with local radio stations, which would bill Foster when the ads ran.  When Foster received the stations' bills, he would attach a cover invoice to Pharoah's for the ads and deliver them to the plaintiff.  Pharoah's then would pay Foster, who in turn would pay the radio station invoices after retaining a "discount" for himself, which was how Foster received payment for his services

Rogers testified that Foster typically brought advertising invoices to Rogers at the end of every month, and always asked that they be paid immediately.  Foster explained that quick payment would maintain the plaintiff's good relationship with the radio stations, who accepted advertising from Pharoah's on credit, a concession he claimed that few bars receive from the media.  Rogers emphasized that Foster "always" told Rogers he was going to pay the radio stations from the money Rogers paid to him.

The parties' dealings apparently were satisfactory until Foster developed cancer in mid-2001.  Foster was diagnosed as having lung cancer on July 20, 2001, and began treatment the next month.  In his absence, Pharoah's started dealing directly with the radio stations that had been running its advertisements.  Rogers learned from the radio stations in September that they had not been paid for running some of Pharoah's ads in May, June and July 2001, even though Pharoah's had paid Foster when he presented the

stations' invoices. The unpaid invoices totaled $33,954.65. Pharoah's paid the May, June, July and August 2001 radio station invoices directly.

Foster has been in the advertising business for years.[2] He claimed that he had excellent credit with the media, and that the radio stations gave him up to 120 days to pay their invoices. However, Foster failed to offer any witnesses or written evidence to corroborate these claims, and his testimony is contrary to other evidence. Specifically, invoices from Clear Channel Broadcasting, Inc. recited that they were payable within 30 days, and Guaranty Broadcasting's invoices were payable upon receipt. Foster denied ever telling Rogers he would pay the media immediately upon receiving the payments from Pharoah's.

The debtor apparently began having personal financial problems when his income declined in early 2001 due to a cut back in Pharoah's advertising budget. The debtor admitted that occasionally he "lived" on his customer's payments, including those from Pharoah's. He used these payments for living expenses and paid the media who ran the customer's ads from money he received later from "other sources" he did not identify. Rogers testified that he was surprised to learn that Foster was "riding" the invoices. On the other hand, Foster said that Rogers knew this was happening all along. Rogers did admit knowing at least by August 2001 that the debtor had cancer and was undergoing treatment. However, Rogers maintained that Foster assured him that he was getting money and was going to pay the media.

---

[2] The invoices introduced into evidence are from "Alternative Advertising," which apparently is an assumed name under which the debtor did business.

Angela Foster testified that her husband did not work after his diagnosis and the start of his chemotherapy. She also stated that she was only making 65% of her teacher's pay at the time and that, after September 2001, neither of them had any income.

Foster cashed the June payment from Pharoah's well before his cancer diagnosis, but cashed the other payments in the period between his diagnosis and the beginning of his treatment.[3] Though he may have intended to pay the radio stations what was owed on the June invoice, and had no reason to doubt his ability to do so eventually, the evidence established that Foster had no ability to pay media for advertising after his diagnosis.

## Discussion

I.    Dischargeability

Bankruptcy Code section 523(a)(2)(A) excepts from chapter 7 discharge any debt

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ---
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

Under 11 U.S.C. §523(a)(2)(A), the objecting party must prove that: (1) the debtor made representations; 2) the debtor knew the representations were false at the time they were made; 3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor relied on the representations; and (5) the creditor sustained

---

[3] Invoices 21059, 20993, 64075 and 64077 were paid on July 18, 2001 and cashed on July 27, 2001. Invoices 71023 and 71025 were paid on August 3, 2001 and cashed on August 13, 2001. Invoices 74142 and 74144 were paid on August 16, 2001 and cashed on the same day. Invoices 72118, 72054, 72055 and 54207 were paid on August 16, 2001 and cashed on August 27, 2001. Invoices 21842, 21859, 72057, 72059 and 72062 were paid on August 29, 2001 and cashed on September 21, 2001. The evidence was that the debtor's "discount" (i.e. the portion he was allowed to keep) of the *total* May through July 2001 invoices would have been about $5,100.

losses as a proximate result of the representations. *In re Bercier*, 934 F.2d 689, 692 (5th Cir. 1991); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

The evidence relating to the transactions between the debtor and Pharoah's after July 20, 2001 satisfies the elements of proof required by *Bercier*. Rogers testified that Foster said that he would pay the advertising invoices immediately after Pharoah's paid Foster. Although the debtor denies this, Foster offered absolutely no independent evidence to corroborate his claim that he had an arrangement different from the payment terms set forth in the media invoices. Moreover, it is not conceivable that Pharoah's would pay Foster without assurances that Foster would in turn pay the media invoices. In light of this, the Court concludes that Rogers's testimony on this point is credible, and Foster's is not.

Surely by the date of Foster's diagnosis, July 20, 2001, the debtor knew or should have known that he would not have the money, considering his own incapacity and his wife's reduced income, to pay the media invoices if he cashed the plaintiff's checks and kept the money. There is no evidence, other than the debtor's word, that he told Rogers he was cashing the Pharoah's checks without intending to pay the invoices promptly. Considering the debtor's financial circumstances at the time of his diagnosis and afterward, the debtor could not have reasonably expected to be able to pay the media invoices and that his representations that he would do so were knowingly false.

Debts falling within section 523 (a)(2)(A) are those obtained by frauds "involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made." *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992), citing *In re Foreman*, 906 F.2d 123,127 (5th Cir. 1990). The fraud necessary to satisfy the statute

may be based on any conduct calculated to convey a misleading impression. Thus, the representation may be either express or implied. *In re Wyant*, 236 B.R. 684, 695 (Bankr. D. Minn. 1999). Andrew Foster cashed or caused to be cashed all the plaintiff's checks after July 20, 2001 knowing almost certainly that he would not be able to pay the advertisers' invoices unless he did so from the Pharoah's payments. The debtor did not prove that he made any effort to inform Rogers of this change in their customary and agreed procedures for paying the radio stations, and Rogers and Pharoah's did not know about Foster's diversion of the money until the advertisers complained in September 2001. Accordingly, Pharoah's has proved that Foster intentionally deceived the plaintiff.

The Court also concludes that Rogers and Pharoah's relied on the debtor's representations that the media invoices would be paid timely after the plaintiff paid Foster. Bankruptcy Code section 523(a)(2)(A) requires that a creditor justifiably rely on the debtor's representations. *Field v. Mans*, 516 U.S. 59, 74-5, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance is gauged by "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case," rather than a community standard of conduct. *In re Mercer*, 246 F.3d 391, 418 (5th Cir. 2001). There was no evidence that Pharoah's and Rogers had reason to question Rogers's belief that Foster would pay the media invoices promptly, as he had in their prior course of dealings. Thus, the plaintiff justifiably relied on the debtor's representations.

Finally, §523(a)(2)(A) requires that the complaining creditor have sustained losses as a proximate result of a debtor's false representations. Pharoah's proved its losses and their connection to the debtor's actions. Pharoah's had to pay the radio stations' May,

June, July and August invoices, even though it already had paid Foster on the same invoices.

II.     Informal Proof of Claim

Finally, the Court will briefly address the debtor's argument that Pharoah's failed to file a proof of claim.

A claim can be nondischargeable even if the creditor has not filed a proof of claim in the record of a case. *In re Grynberg*, 986 F.2d 367, 370 (10th Cir. 1993). A creditor's failure to file a timely claim that would be allowed simply bars it from sharing in any distribution from the bankruptcy estate. *Id.* The issue of dischargeability of a debt is distinct from the allowance of a claim. *Id.* Accordingly, Pharoah's failure to file a proof of claim in this case has absolutely no bearing on the outcome of this adversary proceeding.

## Conclusion

The debt owed by debtor, Andrew Foster, to Pharoah's for the checks he cashed after July 20, 2001, for a total amount of $19,564.45,[4] is non-dischargeable under 11 U.S.C. §523(a)(2)(A).

Baton Rouge, Louisiana, October 22, 2003.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE

---

[4] This amount takes into account the 15% "discount" Clear Channel and Guaranty Broadcasting gave the debtor.